Estate of Amos F. Henry, Deceased.

Argued March 22, 1932.

Before Trexler, Keller, Gawthrop, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*Thomas D. Caldwell* of *Caldwell, Fox and Stoner,* for appellant.

*Earl V. Compton,* for appellee.

Opinion by Trexler, P. J., May 4, 1932:

Nellie Yountz Henry, claiming to be the widow of Amos F. Henry, presented her petition to the orphans' court of Dauphin County, asking that certain assets of the estate to the value of $500 be set aside as her widow's exemption, alleging that after demand, the administrator of the estate had refused to do so. A rule was granted upon the administrator who replied that the petitioner was not the widow of the decedent, that she was no relative of his and has no legal claim against his estate. The question, therefore, is whether there was sufficient evidence to sustain the finding of the court that the petitioner was indeed the widow of Amos F. Henry.

We quote from the opinion of the lower court:

"The deceased at the time of his death was 66 years of age and the petitioner 56. The petitioner and the

deceased lived in the northern part of the city, within five blocks from one another for 25 years and more. The deceased married, built his home at 1918 State Street, lived there, had a family of five children, and his wife died in 1911. The families of both parties for years were intimate. About two years after the death of his wife, the said Amos F. Henry began paying attention to the petitioner and about two years thereafter they became engaged to be married and fixed some time in June, 1919, for the consummation of the marriage. The reputation of the said Henry for chastity, as shown by the testimony, was good and there is nothing therein which discloses that the reputation of the petitioner was otherwise. There is nothing in the evidence showing illicit conduct or meretricious relations between them and both parties had capacity to marry.

"The petitioner in substance testified that at the time of the engagement she was living with her mother and continued after the engagement to live there, where he visited her almost daily; that on May 29, 1919, he and she went to the Harrisburg Cemetery, taking flowers with them for the graves of the deceased's wife and the father of the petitioner; that after placing the flowers on the grave of Mr. Henry's wife, Mrs. McKelvey, a daughter of Mr. Henry, and some others came to the Henry grave, removed the flowers which had just been placed in a vase there, put them aside and placed in the vase flowers which Mrs. McKelvey had brought. Seeing this, Mr. Henry became offended and said, 'Now for this dirty contemptible act, they won't even let the dead rest, I ask God to join us as man and wife, promise me that you will never leave me no matter what happens and I will stick to you until death. Now we are going to be married, I am going to take you as my wife here and now in the sight of God, I ask Him to join us and

make us man and wife, will you swear you will stick to me no matter what happens until death?' she answered: 'I will be your wife until the end.' She further testified that, he took a ring out of his pocket and put it on her finger, which ring she exhibited on her finger in court. There were two witnesses to this, Mr. Manley and George Krebs, both of whom are now dead. He wanted her to move at once and live with him at 1918 State Street, which she declined to do because she feared it would break up his family conditions and the existing friendly relations between the two families. Whereupon they went back to her mother's home where she remained until 1923, he spending much of his time there as her husband, having informed her mother and other members of her family that they were married. During these several years after their marriage they looked at a number of places in which to establish their home and in the year 1923, purchased a lot in Penbrook and built a house thereon, into which they moved in September of that year. The deceased spent much of his time between the two homes until the last seven months of his life when it is admitted he spent the entire time at the Penbrook house with the petitioner, except that he would, while he was working in the City of Harrisburg, take breakfast at 1918 State Street, and the daughter there would prepare his lunch for him, which he took with him to his work. He died rather suddenly in the Penbrook house in September, 1929, leaving there at the house clothing, jewelry and the key to one of his lock-boxes in the vault of some financial institution. Petitioner testified that just before his death, they had a conversation and she then said to him: 'Daddy, do you think our marriage is right,' and he said: 'In the name of God and man we are married and as married as anyone can be, I am satisfied.' These she says were his dying words.

"The petitioner has produced a number of witnesses who testified that the decedent had introduced her as Mrs. Henry or as his wife to them and also that their reputation in the community was that of husband and wife." The lower court then refers to the several witnesses who testified to the occurrences bearing upon the fact that the decedent recognized Mrs. Henry as his wife and that he so introduced her and that his treatment of her was consonant with the marriage relation and that they bore the reputation of man and wife in the community.

The respondent called nine witnesses of whom two were children of the deceased, two nieces, and a son-in-law. The substance of it was to the effect that instead of being with the petitioner nearly all the time, he usually left Penbrook at 10:30 o'clock. One witness testified that the decedent answered the question, "How is Mrs. Henry, or what shall I call her?" "You call her Nellie Yountz, that is her name," and at a prior occasion said, "Who told you that I have a wife?" However, the witness is frank enough to say that the decedent laughed upon both occasions and the conclusion may be drawn that he was trying to be facetious.

A man who did some work on the roof of the Penbrook house testified that the decedent said that he had built the house so as to have a place to come to on Sundays and that "this lady, (referring to the petitioner, although she was not present), keeps house for me. So long as she behaves herself, she shall have a home here as long as I live." A son-in-law of the decedent says that in 1925, the deceased introduced the petitioner to him as Miss Nellie Yountz and the witness' wife testified to the same thing. There were several other occasions to which it is not necessary to refer in particular because they were at times when some members of his family were teasing the decedent

and as one witness remarks, they were just kidding, having a little fun.

Another witness testified that shortly before he died, she asked him why he did not get married. "Never, when I get out of this mess, I will never get in another." Another witness testified that he introduced her and said, "This is my friend." There is some other testimony, but it is of little importance.

The assessor of the borough of Penbrook stated that he called at the residence of the petitioner for the years 1925 to 1929, inclusive, twice a year, and upon inquiry as to who lived there, the petitioner gave her name as Nellie Yountz. She admits that he was there, but says that she gave the name of Mrs. Henry, that she never voted and never paid a tax, except in the year 1929. This is the most damaging piece of testimony that was produced against the petitioner, but the court observes that the assessor might not have heard the answer distinctly and that the testimony, standing alone, does not to any extent overcome the testimony which is in favor of the proof of marriage. The court, considering both sides of the case, came to the conclusion that the petitioner submitted enough evidence to show that she was the wife of the decedent.

In Murdock's Estate, 92 Pa. Superior Ct. 275, which case has been frequently cited, our Brother KELLER, has very fully and clearly discussed the subject of common law marriage and by reference to numerous cases has set forth what is necessary in order to constitute this relation. Although we have quite fully referred to the facts in the present case, an extended discussion of the law is uncalled for.

The marriage relation entered into in the present case was by words of present import. "Now we was going to be married, now; I am going to take you as my wife here and now in the sight of God I ask him

to join us and make us man and wife." "I said I would." This was accompanied by the present of a ring put on her finger and was then followed by cohabitation and reputation. Although there was some testimony to which reference has been made that could be urged as inconsistent with the conclusion that a marriage existed, it was not of sufficient weight to overcome the testimony produced by the petitioner. The court having seen the parties and given credence to the petitioner's witnesses, was warranted in concluding that she was what she claimed to be, the widow of the decedent. There is nothing that requires us to reverse the decree.

The decree of the orphans' court is affirmed. The costs are to be paid out of the estate.